and we'll turn to argument in the third case and final case today which is Connecticut Parents v. Cardona 20-1998. Mr. Keiser? Good afternoon and may it please the court. My name is Chris Keiser and I represent the appellant, Connecticut Parents Union. The Parents Union is a non-profit organization founded a decade ago to ensure that Connecticut parents are connected to resources necessary to protect their children's educational rights without respect to race or socioeconomic status. That mission is what led it to this case. In 2017, the Connecticut legislature expanded an existing racial quota for inter-district magnet schools statewide. The legislature gave the Commissioner of Education the power to promulgate reduced isolation standards and under the standards in 2017, 25% of the students at each school must be reduced isolation students who are primarily white and Asian. The quota therefore capped the enrollment of black and Hispanic students at these schools to 75%. Black and Hispanic parents affected by this quota soon engaged the Parents Union for help. Since then, the Parents Union has been in the charge against the quota. It has poured significant resources into helping parents navigate the process, hosting community events, and opposing the law through rallies and legislative testimony. Under this court's precedent interpreting the Supreme Court's decision in Havens Realty v. Coleman, the Parents Union has standing to challenge the statewide quota. In general, non-profit organizations must meet the same requirements to establish standing as any must demonstrate an injury fairly traceable to the defendant's actions and redressable through a favorable decision. The Parents Union meets all three of these criteria and I'll briefly explain why. First, with respect to injury, the Parents Union has alleged that it has expended and continues to spend considerable resources to advance its established mission through counteracting and The Parents Union's response has required extensive planning, community organizing, and collaboration with parents, teachers, and educational advocates, public outreach, media, and testimony before the state legislature. The Parents Union also organized community events with parents, civil rights leaders, and other community members, and importantly, fielded calls from parents concerned about the racial quota. Often, black and Hispanic parents with children were subject to or failed to get admitted to a magnet school and sought guidance from the Parents Union. Importantly, to partake in these activities, it has had to divert resources from other activities that it normally conducts, including the promotion of a Connecticut law that ended the felony arrest of parents who are enrolling in a school outside their zone district, as well as direct advocacy work for special needs students at IEP meetings. These allegations suffice to establish injury under the court's precedent, which have taken a broad view of the Havens Realty Standards and require only a perceptible impairment of a nonprofit organization's operations in order to establish injury. That impairment normally takes the form of an opportunity cost, where the organization must devote its resources to the problem at hand, here the racial quota, rather than another of its usual activities. Beginning with this court's decision in Reagan v. Harry Mackleville Realty, the court has recognized that even a scant expenditure of resources that could have gone elsewhere establishes the necessary injury. The allegations in the Parents Union's complaint and in Ms. Samuel's declaration are sufficient to And I'll move on to causation, which has caused some of the confusion in this case. This court's cases devote little attention to the causation requirement, but at the same time, they make clear that the district court erred in requiring that the Parents Union show that the racial quota acted directly on it as an organization. Indeed, such a requirement would upend this court's well-settled organizational standing precedent, as none of them involve laws or actions that operate directly on the organization as such. I'll quickly go through the five relevant cases. In Reagan, the organization there was simply a nonprofit with a mission to reduce housing segregation, and the defendant's allegedly racially discriminatory housing advertisement did not legally force it to do anything. Instead, the organization's mission compelled it to spend the resources to counteract those ads. In the Neve v. Dowse, the challenge policy operated only on taxi drivers who were being suspended for being charged with a crime. The organization expended resources to further its mission in aiding those drivers. In the Centro case, the organizational plaintiff was an advocate for the challenge, was in effect in a different town, and it did not require the organization to do anything. The law, however, did frustrate the organization's mission of meeting with day laborers, and therefore forced it to expend more resources to the detriment of its other operations. In Poole v. New York State Children's Coalition, the organization established injury and causation simply by fielding calls from aggrieved foster parents seeking help dealing with the state's alleged failure to make adequate payments, allegedly in violation of law. The coalition wasn't forced to do anything except for that its mission was to help foster parents. And in the Moya case that the state cited in its 28-J letter on Friday, where an organization that provides immigration services is helping their clients become citizens, that's standing to challenge the government's alleged failure to provide a fair process for disability waivers to the citizenship test, merely because that process was going to force them to take more time dealing with their disabled clients, and therefore less time dealing with other clients. None of these cases involved any legal compulsion on the part of the defendant to force the plaintiffs to take any of these actions. Simply put, to establish injury and causation, a parent's union only must allege a perceptible impairment of its activities, diversion of its resources from other activities, in order to advance its established mission. The parent's union easily meets this burden. Once the parent's union was engaged in the statewide racial quota, it devoted significant resources away from other activities in order to both oppose the quota and help parents navigate and understand it, and plan their choices accordingly. An injunction here, of course, on the redressability prong, an injunction here would redress the parent's union's injury by obviating any need to expend any further resources counteracting and approving it. For these reasons, the parent's union satisfies the Article III standing requirements, and the district court was wrong to hold that parent's union lax standing. I just want to say a quick word about the state's argument that this case is now moot due to the August 2020 memorandum issued by the commissioner. The 2020 memorandum, which is issued two days after the parent's union filed an opening brief in this court, does not even repeal the reduced isolation standards that are at issue here. To the contrary, the standards retain an effect, and the schools that are not complying with these reduced isolation standards must be operating subject to an approved compliance plan, which is designed to bring them into compliance. Excuse me, you have a minute left. Since the standards are still in effect, the parent's union still must spend its resources helping parents navigate the quota and leading the public opposition to it. And even if the court will define otherwise, the state has not met the exceedingly high bar of necessary to moot a case through voluntary cessation. The memo does not completely and irrevocably eradicate the quota. After all, it does not even revoke the quota. And a two-page memorandum that could easily be reversed after the case is dismissed is not nearly enough to moot a case, especially when the state does not proclaim the power to reinstitute or to institute the penalties at all. I'll be happy to take your questions. Judge Lynch. Yes, Mr. Kieser. I'm having trouble grasping the breadth of your theory here. It sounds to me as if you're saying that the way the parent's union is injured here is that it has to spend money agitating against this law and bringing this lawsuit. Is that the idea? Your Honor, not quite. If an organization were simply created to- I'm not saying it was created to do this. I'm saying this organization diverted its agenda from one thing to another thing, and the new thing is opposing this law. Is that the point? Your Honor, not quite. Because the parent's union's established mission has been to oppose racial and socioeconomic discrimination, the parent's union only redirected its resources in response to the 2017 law and the reduced isolation standards in order to further its mission, its established mission. And that's the same test that the court has applied in- I'm still puzzled by what you just said. Let me try a hypothetical and see if this helps. Suppose the ACLU comes to court and says, we're in existence for many, many years, and we do lots of different programs, and one of them is women's rights and another one is First Amendment law, but now the government has started a program of warrantless electronic surveillance. And we think that's a really serious problem, and so we've devoted a lot of resources now to that. And we've brought this lawsuit, and we've conducted public forums, and we've spent a lot of money leading the charge against this law. But as a result, we're doing less First Amendment and women's rights work. Do they have standing? Under this court's precedent, it's possible that the ACLU could have standing in that situation. Boy, then we wasted a lot of time in ACLU against Clapper and got ourselves reversed by the Supreme Court saying they didn't have standing, and they were rather foolish because they went to a lot of trouble trying to figure out whether they were injured in their ability to represent clients for fear of being electronically surveilled. But all they'd really have to do, it seems like, is say, we dislike this law so much that we had to divert resources from our other projects to dealing with this problem. I think the problem in Clapper was more that the injury was not sufficiently particularized. That's right. But if they had used your theory, we would never have had to go there because you're saying that this theory would have worked because they could just have said we had to put a lot of money into attacking the Patriot Act. And so that harms us and harms our other mission or the rest of our activities. Well, several courts have raised this objection to this court's precedent in this area, and so has Judge Jacobs in multiple separate opinions, but that's never been adopted in this court. If I look back at those cases, and I recently had another one involving the public charge regulations in the immigration area, but as I recall, what was argued there was that the existence of the law led to a heavy demand on their counseling services, which they provided, and thus increased the cost to them of doing something they were doing already, which is providing counseling services. But it seems to me like what you're saying is just the diversion that somebody could be harmed by the very fact that they've chosen to oppose this law as part of their mission, and that distracts them from other parts of their mission, which I'm not sure that I've seen any case that features that argument as such. Well, first, Your Honor, I think with respect to the counseling, I think this court's decision in school is fairly analogous to part of what the parents' union has done here with respect to receiving calls from parents and giving them guidance as to how to navigate the system, and also what to do with respect to not when they don't get into immigration. Is there any quantification in the record of how much the demand on their services has increased because of some change in this law that now they're getting a lot of calls about this topic that they didn't get before? Isn't this a long-standing statute and regulation in one form or another? There have been statutes since 2005 that have authorized some form of a racial quota at some magnet schools in Connecticut. However, in 2017, the legislature expanded that and that would apply to schools statewide, and that's when Ms. Daniel testified at the hearing of the district court. That's when the calls from these parents, which she said there were dozens of them, I believe she said, that started coming in, and that's when parents started demanding more services, and that's why the parents' union had to go statewide and host these events and these roundtables to help parents understand the law. Also, alongside that, they spent resources on the law so that they wouldn't have to spend resources to help parents, to counsel parents. I think that this court decision in Poole, where the court simply said that the New York State Coalition for Children had standard of it had to field calls from a green foster parent, that is directly analogous to this. And then also, in the court decision in Reagan, there's nothing in that case that would require, other than the organization's mission, would require it to do anything in response to those discriminatory acts. I believe that, and this court in Yeeby has addressed the fact that the Second Circuit precedent under Haven's Realty is quite broad as compared to other circuits, and there might be any number of reasons for that, but under the, but Yeeby court made clear that what the court is really, really interested in is that an organization isn't trolling for litigation or basically just creating litigation expenses and making that into an injury, and that's not what we have here. We clearly have an organization who invested a lot of time and energy outside of this litigation and would have done so even aside from the fact that it helps them to get standing. This isn't about an organization trolling for standing here. So I think that this court's cases do allow an organization to, there's a line. Okay, I think I've got your point. Thank you. Judge Marrero. Thank you. Picking up on Judge Lynch's point concerning quantification, do you see that or contend that there is some kind of scale of diversion of resources that starting from zero and going to 10 or 200, somewhere along that scale would confer standing? Your Honor, well, there is a threshold, but the threshold has only been described as the requirement is that an organization alleged can't diversion of resources. That's what the court said in the Neavy case, and the court commented there that even if the organization, the taxi driver association would have only counseled two or three taxi drivers a year on the suspension issue, that that would have still been enough to confer standing on the organization. And then in the Reagan case, the court said that even though a substantial amount of the expenditures in that case were directly related to litigation, the court had enough, that the amount of profit there still had enough to establish standing. So I would simply say that there is a line, but it's less than what the parents union has alleged. Follow up question. What do you contend specifically were these services that you diverted to doing beyond just generally or in the abstract, expending time and resources? What exactly more did you do that would satisfy the standing element? Your Honor, are you asking about what activities the parents union had to forgo because of this? Yes. Yes. So there are several things, but most specifically, the parents union had to drastically cut back on its advocacy of other laws, including a law that ended the felony arrest of parents who enrolled their children in schools outside their zone district. And then a lot of what the parents union does is direct advocacy work on behalf of special needs students who have individualized education plans in IEP. And they had to cut back on that work as well in response so that they could devote some of their limited resources to the racial quota issue. By virtue of having to cut back on those other services, did the organization suffer some other byproducts, some other consequences, for example, losing grants or funding from other sources that you would have obtained for those services? Your Honor, there's nothing in the record about that, but I also don't believe that that is a requirement in this court's case law, that the court's cases simply speak to the diversion of resources that would have been used for something else that the organization mission would normally allow. And here we have concrete examples and also general allegations of resource diversion. Thank you. Counsel, I have a couple of questions which may cover, will cover some of what you've already said in response to my colleague's questions. On your theory of standing, as I understand it, your client could challenge virtually any law relating to education. Is that a fair assessment of the situation? Your Honor, I'm not sure that that's quite true. There's a significant roadblock to that because in order to establish standing, the organization has to demonstrate through the expenditure of resources that it cares enough about the individual that it's in, and its supporters care enough about the individual's law that it's challenging. So, just any education law, chances are the Parents' Union wouldn't have standing to challenge just any law if it didn't show the significant dedication to expending resources that it's here. I think that acts as a significant limitation on this standing doctrine, and also so does the fact that it must be part of the established mission. And I think if the established mission is defined too broadly, then there might be an issue with respect to this. But here, we don't have that. This is directly in the wheelhouse of the Parents' Union's established mission. So, I don't think the court would have to go anywhere outside of what is already decided in the five cases cited in the briefing to get where the Parents' Union wants to go. And what do you make of the distinction between social services organizations and advocacy organizations that the state puts forward for purposes of our standing inquiry? Your Honor, I don't find that distinction really anywhere in the Second Circuit case law. I see it in some district court cases that the state has cited. However, this court has never really explained what the difference between those two things might be or how it would relate to standing. And in any event, I think the Parents' Union is sort of a combination between the two, an advocacy and a social services group, because it does provide services to parents through this sort of counseling that Ms. Samuel testified about. And it also is an advocacy group that is hoping to overturn this law and reduce isolation standards. So, I think even if that distinction were something that's been in the Second Circuit case law, that it wouldn't hurt us. Now, you're aware of the January 22 28-J letter from the state, are you not? Yes. I would say that the Moya case that's cited in there was issued in September, so it actually predates the state's response to these. But I don't think that that case, I think that case basically stands for the same proposition as Centro. And indeed, in Judge Jacob's concurrence and I guess partial dissent on that issue, he said that basically that the Moya case was an extension of Centro and he had already dissented in Centro. So, I think that case doesn't really stand for the proposition that doesn't help the state as much as the state might believe. Okay. Let me ask you about the reduced isolation standards. I take it that you're alleging that these standards made it more complicated, more dangerous, or more expensive for you to engage in outreach and advocacy. Is that a fair characterization of your argument? Somewhat, Your Honor. I think more directly, it increased our burden by when the quota expanded statewide and the reduced isolation standards were promulgated. That's when the Parents Union was asked to participate in a much more expansive manner with respect to counseling and with respect to the advocacy. And that only happened in 2017. So, the reduced isolation standards contribute to that because they set the quota as a concrete number and that's what set off sort of this parents contacting the Parents Union for advice and help. And then the Parents Union going throughout the state to have these community events and then the advocacy. So, I think, yeah, I think, I mean, it's a combination of all these things. All right. Well, you reserved one minute and we'll come back to you. Let's hear from Mr. Darren Cunningham. Thank you, Your Honor. Can you hear me okay? I think so. Great. Assistant Attorney General Darren Cunningham on behalf of Commissioner Cardona and the Connecticut defendants. Your Honor's opposing counsel and may it please the court. This case should be dismissed for two separate reasons. First, as the district court held, the plaintiff, the Connecticut Parents Union has failed to show constitutional injury. If mere opposition to well-established state policy suffices to establish constitutional injury, virtually no interest group will lack standing in federal court. And in this case, for good matter, the plaintiff's group does not even a parent or a student. So, it would allow such a group to challenge inter-district magnet schools run by eight school districts in Connecticut and five rests containing no students. The second reason this case should be dismissed is that since this appeal was filed, the Commissioner of Education has issued a penalty waiver to all inter-district magnet schools. This fundamental change renders plaintiff's challenge moot. And I'll first discuss the parties. This court has found a perceptible impairment sufficient to constitute constitutional injury where organizations were involved in social services. Each engaged in providing social services and the laws and conduct they were challenging made it more difficult or more expensive. The Connecticut Parents Union is arguing for an expansion of circuit precedent. The Connecticut Parents Union's plenary vision of Article III standing would effectively eviscerate the law of standing. To allow Article III standing based on merely allocating resources in opposition to a state law would be a marked step further than the holding in Centro. It would permit every interest group to have standing to challenge laws with which they disagree. This would completely swallow Article III limitations. And in this case, it would allow an interest group to assert claims affecting Connecticut's inter-district magnet schools. This is completely contrary to the Supreme Court's explanation that the decision to seek judicial review be placed in the hands of those who have a direct stake in the outcome and not in the hands of concerned bystanders who will use it simply as a vehicle for the vindication of value interests. And it bears considerable federalism concerns given that public education is largely a state and not a federal matter. The plaintiff relies on at least four cases from this court which it argues are completely consistent with the finding of standing here. And I know all the judges on this panel are very familiar with this issue having dealt with it recently. Judge Lynch, I know, discussed the public charge case. I know Judge Moreau issued a case on this point in October. And Judge Cabranes, I know that you dealt with this in the McAuliffe case which contained opposing counsel. The Reagan case from 1993, like the Hayden's case from the Supreme Court, involved a non-profit dedicated to eliminating housing discrimination. Standing existed because they were forced to devote significant resources to identify and counteract the advertising practices issue. Nebbe versus Davis, also from this court in 2011, does not help the plaintiffs. That case involved the New York Taxi Workers Alliance and they had standing to challenge a New York City Taxi and Limousine Commission policy that suspended a driver's license without a hearing. The union expended monetary resources to support its own It was not merely a disagreement with policy, which is the case here. And in particular, the Nebbe court warned of manufactured litigation standing cases and particularly discussed a Third Circuit case where the litigation was manufactured by a group combing newspapers to find violation of housing discrimination acts. That's essentially what has happened here, Your Honor. And I would say opposing counsel used the word trolling, but if you look at the Nebbe case, the term is manufactured litigation. And the Connecticut Parents Union has found this policy. As was discussed with Judge Lynch, these bank school laws in some form have existed since a public act passed by the Connecticut General Assembly in 2002. The central case was a pre-enforcement challenge, so a relaxed standing rule applied. Also, the holding of Centro was that if a challenge law forced an organization to expend resources to counteract activity that harms its core activities, it may have standing, but the expenditure of resources must be a result of the harm to the activity. And in Centro, it was the service to the workers. The Plu case discussed by counsel is also not helpline. And I need to make a couple points about this case. First of all, it involved the Children's Advocacy Organization. And if you read the opinion, the organization contained members who were foster parents. And as I stated before, the Connecticut Parents Union contains no parents, contains no students. And the challenge concerned lack of adequate foster care maintenance payments. Now, opposing counsel referred to the fact that this case helps him because he said there was testimony from Ms. Samuels about fielding calls. And I need to be clear about this. What happened at the oral argument was that Judge Underhill began questioning Ms. Samuels. She was not under oath. This was not testimony. He had a discussion with her. If you read the transcript, he asked opposing counsel if he wanted to – there was a discussion about whether there would be a proffer. Judge Underhill said he didn't care. And then he questioned back and forth with Ms. Samuels. It was not testimony. We don't think it's proper to account for it in your decision. And also, the Mueller case has been discussed. And that's the subject of our 28-J letter. And that, too, involves immigration services and we think supports our argument. The McAuliffe case also is discussed in our brief. And McAuliffe case should be very familiar. Judge Cabranes was on the panel. My opposing counsel argued that case. All I can say is that it was a similar challenge. It involved the way the schools were chosen in New York City. And this court, at the end of the day, did not conclude that they were standing. It said even if the plaintiffs had standing. And finally, I'd like to move to the mootness issue. And that was discussed, obviously, and I don't want to repeat anything, but because of the statute 264R, it is within the commissioner's authority to define which students are considered reduced isolation and what penalty to impose. Indeed, the complaint makes clear that the Connecticut Parents Union is really challenging the 2017 memorandum, which has been replaced with the 2020 memorandum. The 2020 memorandum makes clear that there is no such penalty for failing to meet what the plaintiffs call a racial quota. There's also no state action. The state does not conduct the lottery for these schools. Counsel mentioned a compliance plan, but the compliance plan is not a penalty. Justice Kennedy's concurrence in the Seattle schools case makes clear that schools can pursue policies designed to increase the diversity of schools. These compliance plans do such a thing. They're simply filed by the schools and they require them to explain how they're going to try to meet the existing standards of 75-25. But again, there's no penalty and the in their brief, the plaintiffs make short shrift to the fact that there is no longer a penalty imposed. However, if you look at their second prayer for relief, and there are only two prayers for relief, they request that the defendants be enjoyed from, excuse me, enjoined from quote adopting, enforcing, attempting, or threatening to enforce the 75% cap on Black and Hispanic students who may attend inter-district magnet schools in the state of Connecticut. That's found in their appendix at page 21. The 2020 memorandum does exactly that. It takes away the penalty. And counsel talked about how the memo could be repealed at any time. What I would say to that is, again, what they were essentially challenging is the memo. So they can't turn around and say, well, the memo could be changed anytime. Well, it was changed. And furthermore, support for the fact that the state will not go back on it is that in the Hartford area magnet schools, the state has already gone to a race-neutral system. And I might add, the state conducts the lottery in the Hartford area magnet schools, the so-called chef magnet schools. It does not conduct the lottery for the rest of the state. I would also like to point out that if you look at Ms. Samuel's affidavit, I think it portrays a very different picture of the organization than counsel did. I think it makes clear that before learning of the 2017 memorandum, the Connecticut Parents Union engaged in things like lobbying over bills concerning residency issues. And I think once learning of the 2017 memorandum, Ms. Samuel's engaged in advocacy against it, testimony, community meetings, speaking with elected officials, et cetera. And turning back to the standing issue, I think that shows that they are an advocacy group. And counsel, when asked by Judge Lynch, he could really not give a limiting principle for this concept. And whatever the cases of this circuit have said, I think we are now at the point where there has to be a limiting principle or there's just no barrier whatsoever to Article III standing. And to that point, we would... I'm sorry? We have a minute left. I'm sorry. Thank you so much. And just in closing, I would say our position is that Judge Glasser's opinion in Young Advocates makes the most sense if this court is to have any standing under Article III. In that case, the plaintiff, like the Connecticut Parents Union, was really an advocacy group with an opposition to a change in the law concerning schools. And at that point, I'll conclude my argument, Your Honor, and take any questions. Judge Lynch. No questions. Thank you. Judge Marrero. A couple of questions. The district court, in this case, concluded that the plaintiff or the complaint does not allege that parents whose children were impacted by the act were, quote, forced to seek assistance from a CTPU, nor does it allege, quote, that the parents calls coerced or otherwise compelled CTPU to expend resources to oppose the act. Is this the proper task for traceability under Havens and its progeny? In other words, is an injury only fairly traceable to a challenge law or policy when the organizational plaintiff is, quote, forced, end quote, to address that challenge law? What does it mean to be, quote, resources in opposition to a challenge law? First question. I have another one follow up. Thank you, Your Honor. Thank you for the opportunity to answer that. I think that the, first of all, to say what is forced, I think it's easier in cases like maybe with the taxi and limousine service. That's a very clear cut case, right? And then I think you have the importance of the social service organizations, which at least have membership and something that you can cling on to in terms of compulsion. And I just think that that's lacking in this case. Like I said, there's no evidence of membership of the Connecticut Parents Union. And in the case also brought by opposing counsel in the Hartford region, there were actual parents and students as plaintiffs. So I think there needs to be something much more connected to the organization. This organization, I think, is under the most charitable definitions, fairly nebulous. And I think as Judge Cabrera has pointed out, I do think that under their argument, they could challenge any education law in the state of Connecticut, as long as they could find, you know, an equal protection hook or something else. I don't see why they wouldn't be able to if they're allowed standing in this case. I hope that answers your question, Your Honor. Yes, and it raises the second portion of my question, which is in order to guard against the concern of opening up the gates to any organization to challenge the law that they disagree with, the standing doctrine has some limiting principles. It requires that the organizations have a core mission, that the organization has expended time and resources in exercising that core mission, that the organization's service is being paired in some way by its exercise of opposition to a policy or legislation. So, in this case, there are not at least some indications that the appellant satisfies some of those safeguards, in that it has expended time and resources. It claims that its services, other services have been impaired. It claims that what it has been doing in opposing this policy is part of its core mission. For the purposes of a motion to dismiss, are not those allegations sufficient? I think that they're insufficient. I'm sorry. Did I interrupt you, Your Honor? Yes, I'm here. Okay. I don't think that it does mean it. I think that, again, if you look at Ms. Samuel's affidavit and the pleadings in the advocacy group, and I really think that that's a very big difference. It's very clear that they do not like these laws and policies, or they, I should say, the Connecticut Parents Union, does not like Connecticut's current laws and policies. They've effectively lobbied to change them. They've tried to gin up support. They've met with legislators. I understand all of that, but I think that that is very different than these cases in the social service organizations, including the one that Your Honor dealt with in your decision in October. I think that there's a clear distinction drawn. Again, this is what Judge Glasser talks about in his decision. I do not think, if you read the affidavit and if you read the complaint, and again, I would just repeat that I don't think it's fair to look at the exchange with Ms. Samuel's because it was not testimony. She was not placed under oath. Thank you. Mr. Cunningham, I have just a very quick question. In your view, this is not a so-called causation case, is it? As opposed to an injury case, understand? I actually agree with opposing counsel when he says the issues are kind of blended. I know that Underhill sort of took the case a little differently than both myself and opposing counsel. It was different counsel at the trial level, but we've mostly focused on injury, I suppose. But I do think that it should be rooted back in the fact that allowing a group that has no parents and no students to affect statewide inter-district magnet schools, of which none of their members attend, none of their members applied to attend, I think that that's a far cry from what this court has allowed, and I think that it's completely contrary to even what the Supreme Court talks about in Havens. Okay. Absent any further comments from Mr. Cunningham, we'll turn to Mr. Kieser for one minute. Thank you, Your Honor. Go ahead. Can you hear me? Well, now I can. I don't know about the others. Can we hear Mr. Kieser? I think I was on mute before, so I just want to make sure that everyone can hear me. Judge Lynch? Judge Lynch may not be able to hear you. I hear you. Judge Montero? No, I can hear him now. I can. Okay. Okay. Yes, I can hear him. Okay, good. All right, Mr. Kieser, you have one minute. I just want to say a few quick things first on the proffer by Ms. Daniel at the district court. I don't believe that was objected to in the district court or see any mention of it in the response brief. This is the first time I've heard that the opposing counsel objected to that being in the record. Second, as far as the Krista McAuliffe case goes, the issue there in this court was that the court did not believe that the plaintiffs had alleged future injury sufficient for an injunction. The court didn't comment on whether the district court's decision in that case, Judge Ramos' decision, was correct. I think that case also supports us. It lends itself to sort of a split of authority among the district courts. Finally, I do think I just want to emphasize that we're challenging the statute and the reduced isolation standards that flow from the statute. The reduced isolation standards are where the 7525 number comes from. The statute gives the commissioner the power to enact that. There's no evidence. The state doesn't say that schools are actually changing their behavior and we're ignoring the quota now that the diswaiver from 2020 is in place. As long as schools believe that the quota are acting under these compliance standards, my client is going to have to continue to expend resources counteracting this law and the reduced isolation standards, which are still in effect. Unless there are any further questions, I will rest on our brief. Thanks very much. Judge Lynch or Judge Meijer, do you have any questions? No, thank you. No, no further questions. We'll reserve decision in this case as well and we are adjourned. Court stands adjourned.